**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

Case No.:

EIGHTPOINT TECHNOLOGIES
LTD. SEZC, and EIGHTPOINT
INTERACTIVE, INC.

Plaintiffs,

v.

BLAZERBROWSER.COM, LLC,
BROADBURST MEDIA, LLC,
NEARSET, LLC,
TUCKER INTERACTIVE, LLC,
BENJAMIN TUCKER,
RYAN HORVATH, and
BRYAN JOHNSON,

Defendants.

_________________________________/

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs, Eightpoint Technologies Ltd. SEZC ("Eightpoint Technologies") and Eightpoint Interactive, Inc. ("Eightpoint Interactive", together with Eightpoint Technologies, "Eightpoint") sue Defendants, BlazerBrowser.com, LLC ("Blazer LLC"), Broadburst Media, LLC ("Broadburst"), Nearset, LLC ("Nearset"), Tucker Interactive, LLC ("Tucker Interactive"), Benjamin Tucker ("Tucker"), Ryan Horvath ("Horvath"), and Bryan Johnson ("Johnson", together with Blazer LLC, Broadburst, Nearset, Tucker Interactive, Tucker, and Horvath, the "Defendants"), and allege:

## NATURE OF THE ACTION

1. This is an action for damages and permanent injunctive relief due to Defendants' misappropriation of trade secrets, copyright infringement, and contractual and fiduciary breaches, following the departure of two high-level employees at Eightpoint Interactive and their development and launch of a competing web-browser product built in part from Eightpoint Technologies' source code.

2. Eightpoint alleges herein that former employees of Eightpoint Interactive, Tucker who resides in Florida, and Horvath who resides in Kansas, resigned, incorporated respective shell corporations to avoid personal contractual obligations, and immediately began developing a copy-cat competitor named "Blazer Browser" that was built upon Eightpoint's proprietary software and trade secrets and which imitates Eightpoint's product architecture, monetization strategy, and go-to-market playbook.

## INTRODUCTION

3. Eightpoint develops, distributes, and monetizes Wave Browser, a Chromium-based desktop web browser distributed through paid-acquisition channels and monetized through a proprietary combination of search syndication, sponsored content feeds, and analytics infrastructure. Over several years, Eightpoint invested substantial resources to develop confidential and proprietary information concerning Wave Browser's technical

architecture, monetization design, unit economics, distribution strategy, and customer-acquisition methods.

4. Horvath was Eightpoint Interactive's Chief Technology Officer and directly oversaw the development of Wave Browser. Tucker was Eightpoint Interactive's Vice President and General Manager responsible for Wave Browser's product development, distribution, and marketing. Both occupied positions of trust within Eightpoint, had access to Eightpoint's most sensitive information, and were bound by written confidentiality agreements and restrictive covenants. In fact, Horvath separately executed a non-competition and non-solicitation agreement.

5. Horvath and Tucker left Eightpoint Interactive in 2024 and, shortly thereafter, a competing browser product named "Blazer Browser" was released. Blazer Browser mirrors Wave Browser's proprietary parameter taxonomy, monetization plumbing, new-tab-page architecture, install-flow design, satellite domain naming convention, and branding, among other things.

## PARTIES

### A. Plaintiffs

6. Plaintiff, Eightpoint Technologies, d/b/a Wavesor Software, is a special economic zone company organized under the laws of the Cayman Islands, with its principal place of business in George Town, Cayman Islands.

Eightpoint Technologies owns and operates the intellectual property associated with Wave Browser and operates Wave Browser through its Wavesor Software trade name.

7. Plaintiff, Eightpoint Interactive, f/k/a Spigot, Inc., is a corporation organized under the laws of the state of Nevada, with its principal place of business in Fort Myers, Florida. In connection with Wave Browser, Eightpoint Interactive provides product development, marketing, back office support services pursuant to arm's-length agreements with Eightpoint Technologies.

**B. Defendants**

8. Defendant, Blazer LLC, is a limited liability company organized under the laws of the state of Delaware. Blazer LLC was incorporated on June 25, 2025. Blazer LLC publishes and operates the Blazer Browser product and distributes it to consumers throughout the United States.

9. Defendant, Broadburst, is a limited liability company organized under the laws of the state of Florida with a principal place of business in Fort Myers, Florida. Broadburst was incorporated on October 31, 2024. Broadburst is managed by Tucker and is the named publisher through which Blazer Browser's content-feed revenue is routed.

10. Defendant, Nearset, d/b/a Nearset AI, is a limited liability company organized under the laws of the state of Kansas with a principal place of business in Wichita, Kansas. Nearset was incorporated on November 25,

2024. Nearset is managed by Horvath and provides browser-development and related services to Blazer Browser.

11. Defendant, Tucker Interactive, is a limited liability company organized under the laws of the state of Florida with a principal place of business in Fort Myers, Florida. Tucker Interactive was incorporated on September 8, 2025. Tucker Interactive is managed by Tucker and is a technology and digital-commerce entity that operates in conjunction with one or more of Broadburst, Nearset, and Blazer Browser.

12. Defendant, Tucker, is an individual residing in Fort Myers, Florida. Tucker was the Vice President and General Manager of Product Development and Marketing at Eightpoint Interactive, with direct responsibility for Wave Browser.

13. Defendant, Horvath, is an individual residing in the state of Kansas. Horvath was the former Chief Technology Officer of Eightpoint Interactive, where he directly managed the development of Wave Browser.

14. Defendant, Johnson, is an individual residing in the state of New York. Johnson is the public spokesperson and media contact for Blazer Browser. Upon information and belief, Johnson is the Chief Financial Officer of Blazer LLC and associated with the ownership, management, and operation of Blazer LLC.

### C. Relevant Non-Parties

15. Non-Party, Joel Felsinger ("Felsinger"), is a former employee of Eightpoint Interactive, who participated in the development of Wave Browser. Upon information and belief, he may be participating in the management and operation of Blazer Browser.

16. Non-Party, Jean Maxime Lautier-Benon ("Lautier"), is a former employee of Eightpoint Interactive, who participated in the development of Wave Browser. Upon information and belief, he may be participating in the management and operation of Blazer Browser.

17. Non-Party, Alec Bolton ("Bolton"), is a former employee of Eightpoint Interactive, who participated in the development of Wave Browser. Upon information and belief, he may be participating in the management and operation of Blazer Browser.

18. Non-Party, Zachary Coulter ("Coulter"), is a former employee of Eightpoint Interactive, who participated in the development of Wave Browser. Upon information and belief, he may have participated in the management and operation of Blazer Browser.

19. Non-Party, Brian Setaro ("Setaro"), owns and operates Hudson Interactive LLC, a vendor of Eightpoint's, and co-founded Broadburst with Tucker. Upon information and belief, he may be participating in the management and operation of Blazer Browser.

## JURISDICTION AND VENUE

20. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1338, and 28 U.S.C. § 1331 as this action arises under 18 U.S.C. § 1836, *et seq.*, the Defend Trade Secrets Act, and 17 U.S.C. § 101, *et seq.*, the Copyright Act.

21. Supplemental Jurisdiction over the state-law claims is proper pursuant to 28 U.S.C. § 1367(a), because the state-law claims arise from the same case or controversy as the claims over which the Court has original jurisdiction.

22. Personal jurisdiction over Tucker is proper because he resides in this District, and the claims against him arise from his operation of a Florida business, breach of obligations in Florida, and tortious acts committed in Florida.

23. Personal jurisdiction over Horvath is proper because he consented to jurisdiction in Florida. Section 7 of the Non-Compete provides that "the interpretation, validity, enforceability, and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida," and further provides:

> Any and all claims or actions arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in Lee County, Florida; and each of the parties consents and waives all objections to jurisdiction and venue in such courts.

Employee Non-Solicitation, No-Hire, and Non-Competition Agreement, § 7. A true and correct copy is attached hereto as Exhibit A.

24. Independently of his consent, personal jurisdiction over Horvath is proper pursuant to Fla. Stat. § 48.193(1)(a)(1), (2), and (7), and consistent with due process. Horvath served as Chief Technology Officer of Eightpoint Interactive, a company with its principal place of business in Fort Myers, Florida, and his confidentiality, non-use, and restrictive-covenant obligations under his Proprietary Information and Inventions Agreement and Non-Compete. Horvath breached those obligations by failing to perform acts required to be performed in Florida (namely, preserving the confidentiality of, and refraining from using, information belonging to a Florida-headquartered company) and committed tortious acts directed at Eightpoint Interactive and causing injury thereto in Florida. Horvath further acted in concert with Florida residents Tucker and Broadburst in developing, launching, and monetizing Blazer Browser, a product whose content-feed revenue is routed through Broadburst in Fort Myers, Florida, and which is distributed to and used by consumers in Florida.

25. Personal jurisdiction over Broadburst is proper because it is organized under the laws of Florida and maintains its principal place of business in Florida. Personal jurisdiction is also proper pursuant to Fla. Stat. § 48.193(1)(a)(1) & (2), because Broadburst operates, conducts, engages in, or

carries on a business in Florida and the claims against it arise from acts committed in and directed into Florida.

26. Personal jurisdiction over Blazer LLC is proper pursuant to Fla. Stat. § 48.193(1)(a)(1) & (2), because it operates and carries on the business of distributing Blazer Browser to consumers in Florida, committed tortious acts within Florida, purposefully directed its conduct at Florida by routing Blazer Browser's monetization through Broadburst, a Florida company, and distributed installable software products to Florida residents.

27. Personal jurisdiction over Nearset is proper pursuant to Fla. Stat. § 48.193(1)(a)(1) & (2), because it operates and carries on the business of providing browser-development services for Blazer Browser, purposefully directed its conduct into Florida, including by developing a browser product that Blazer Browser distributes to, and that is used by consumers in Florida, and acted in concert with Florida residents Tucker and Broadburst.

28. Personal jurisdiction over Johnson is proper pursuant to Fla. Stat. § 48.193(1)(a)(1) & (2) because he participates in the operation, management, or promotion of a product distributed into Florida, and committed or directed tortious acts causing injury in Florida and acted in concert with Florida residents Tucker and Broadburst.

29. Personal jurisdiction over Tucker Interactive is proper pursuant to Fla. Stat. § 48.193(2) because it is engaged in substantial and not isolated

activity in Florida, is organized under the laws of Florida, and maintains a principal place of business in Florida. Personal Jurisdiction over Tucker Interactive is also proper pursuant to Fla. Stat. § 48.193(1)(a)(1) & (2) because it is controlled by and acts as an instrumentality of Florida resident Tucker and committed or directed tortious acts causing injury in Florida and acted in concert with Florida residents Tucker and Broadburst.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), and in the Fort Myers Division under Local Rule 1.04(b), because all or a substantial portion of the events giving rise to the claims pled occurred in this District, including the formation and operation of Broadburst.

31. Defendants, either individually, or through their agents have committed tortious acts against Eightpoint within this district, and have engaged in intentional, wrongful, illegal, and tortious acts, the effects of which Defendants knew and intended to be felt in the United States and the State of Florida.

## GENERAL ALLEGATIONS

### A. Eightpoint's Wave Browser and Trade Secrets

32. Eightpoint develops and operates Wave Browser, a Chromium-based desktop web browser. Eightpoint Technologies owns the intellectual property associated with Wave Browser and operates it through its Wavesor Software trade name. Eightpoint Interactive provides associated product

development, distribution and marketing services, and employed Horvath and Tucker.

33. Wave Browser is monetized through a proprietary combination of (a) search syndication through Yahoo hosted Search under designated partner and implementation parameters; (b) a remotely hosted new-tab page that serves a sponsored content feed and an embedded search input; and (c) an analytics and attribution infrastructure that ties each user session, install cohort, advertising campaign, software version, and subscription tier to monetization events. Eightpoint developed this combination over a period of years and at significant expense.

34. The information at issue includes, by category and without disclosing its contents: (a) the specific design and field taxonomy of Wave Browser's user-tracking, session, campaign-attribution, and subscription-tier parameters, and the architecture by which those parameters are passed to remote endpoints; (b) the structure of Wave Browser's impression-tracking and analytics infrastructure, including endpoint conventions and the server-pushed configuration that governs them; (c) Wave Browser's search-configuration, failover, and conversion-instrumentation design; (d) Wave Browser's install attribution model and new-tab-page architecture; and (e) Wave Browser's business strategy, unit economics, media-buying methods,

distribution-partner relationships, and customer-acquisition playbooks (collectively, the "Eightpoint Trade Secrets").

35. The Eightpoint Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from their disclosure or use. The specific combinations and architectures described above are not native to the open-source Chromium project, are not industry-standard browser conventions, and are not required by any search-syndication program; they are custom designs developed at Eightpoint to operate a paid-distribution browser business. The protected secrets are the specific combination and architecture as an integrated whole—the field taxonomy, endpoint conventions, and server-pushed configuration scaffolding—which Eightpoint developed and field-tested through years of live production deployment, and not any generic concept of user tracking, analytics, or browser monetization.

36. Eightpoint took reasonable measures to keep the Eightpoint Trade Secrets confidential, including by requiring employees with access to proprietary information to execute written confidentiality and assignment agreements, by limiting access to sensitive information to personnel with a need to know, and by obscuring certain monetization parameters in its

production software. The Eightpoint Trade Secrets relate to a product used in, and intended for use in, interstate and foreign commerce.

**B. Horvath and Tucker's Contractual Obligations**

37. Horvath served as Eightpoint Interactive's Chief Technology Officer and directly managed the development of Wave Browser. In that role, Horvath had access to the full range of the Eightpoint Trade Secrets, including Wave Browser's source code, technical architecture, and monetization design. Horvath voluntarily resigned his position as Chief Technology Officer, with his employment ending on September 13, 2024. Upon information and belief, Horvath's resignation was motivated by the opportunity to improperly compete with Eightpoint through Nearset and Blazer Browser.

38. Horvath executed two written agreements with Eightpoint Interactive (then Spigot, Inc.): the Proprietary Information and Inventions Agreement (the "Horvath PIIA"), a true and correct copy of which is attached hereto as Exhibit B, and the Employee Non-Solicitation, No-Hire, and Non-Competition Agreement (the "Non-Compete"). *See* Ex. A.

39. Section 2.1 of the Non-Compete prohibits Horvath, for twelve (12) months after his employment ends, from "start[ing]-up, engag[ing] or invest[ing] in, own[ing], manag[ing], operat[ing], financ[ing], control[ing], or participat[ing] in, . . . or render[ing] services or advice to, any business whose products, services or activities compete, in whole or in part, with" any of the

business division(s) of Eightpoint Interactive with or for which he worked during his final twelve (12) months of employment, and from "accept[ing] any position or affiliation with a competing business in which [he] would be required or expected to reveal or otherwise use any Proprietary Information anywhere in the world that [Eightpoint] sells or markets its products and services or otherwise does business as of [his] termination date."

40. Section 2.1 describes the business of Eightpoint Interactive as "the designing, researching, developing, creating, engineering, programming, licensing, selling and making available products and services for advertising via the Internet or mobile phone networks," including "creating content such as games, toolbars, adware programs and/or similar applications" and "assisting content providers and aggregators such as web sites, search engines, domain parking companies, toolbar applications, owners of domains, application and or other distribution channels in monetizing the consumer audience by displaying promotions or advertisements through the Internet or mobile phone networks." Wave Browser—a Chromium-based browser application distributed through paid-acquisition channels and monetized through search syndication and sponsored content—falls squarely within that description.

41. Section 2.2 separately bars Horvath, for twelve (12) months post-employment, from soliciting Eightpoint's advertisers or publishers (including

prospective advertisers or publishers) whom he serviced, solicited, or attempted to solicit, with whom he had contact, or of whose identity he learned as a result of his employment.

42. Section 2.3 imposes a perpetual restriction, with no time limit, against using Eightpoint's trade secrets to divert any business or business relationship, including by soliciting or interfering with Eightpoint's customers, vendors, suppliers, employees, independent contractors, or other service providers with whom he came into contact or learned of during his employment.

43. Section 3 recites that a violation "could cause [Eightpoint] irreparable harm and significant injury" for which a remedy at law is inadequate.

44. The Horvath PIIA imposes a perpetual obligation of confidentiality and assigns Horvath's inventions and works of authorship to Eightpoint. Ex. B, §§ 3(a), 3(d). Section 7 of the Horvath PIIA further acknowledges that a violation of its covenants "may cause the Company irreparable injury for which adequate remedy at law will not be available," and obligates Horvath to indemnify Eightpoint for all losses arising from any breach, including reasonable attorneys' fees and expenses. Id., § 7.

45. Tucker served as a senior product leader at Eightpoint Interactive in roles culminating as Vice President and General Manager of product

development and marketing. Tucker led the design and deployment of Wave Browser and defined its product vision and distribution strategy. Tucker also had access to Eightpoint's business strategy, unit economics, media-buying methods, distribution-partner relationships, and customer-acquisition playbooks.

46. Tucker voluntarily resigned his position, with his employment ending on March 15, 2024. Upon information and belief, Tucker's resignation was motivated by the opportunity to improperly compete with Eightpoint through Broadburst and Blazer Browser.

47. Tucker executed a Proprietary Information and Inventions Agreement with Eightpoint Interactive (then Spigot, Inc.) on January 7, 2017 (the "Tucker PIIA"). A true and correct copy is attached hereto as Exhibit C. The Tucker PIIA imposes a perpetual obligation, both during and after employment, to hold Eightpoint's proprietary information in confidence and not to use or disclose it. Ex. C, § 3(a). The Tucker PIIA also assigns to Eightpoint all inventions and works of authorship made during employment as "works made for hire," *Id.*, § 3(d), bars Tucker, during the term of his employment and for one (1) year thereafter, from encouraging or soliciting any Eightpoint employee to leave, *Id.*, § 3(g), and bars competitive activity during his employment. *Id.*, § 3(i). Execution of the Tucker PIIA was a condition of Tucker's employment, and Eightpoint Interactive accepted the Tucker PIIA

and performed under it by employing and compensating Tucker for more than seven years thereafter.

48. As senior fiduciaries with access to Eightpoint's most sensitive information, Horvath and Tucker each owed Eightpoint duties of loyalty and good faith, and a contractual duty of confidentiality which included duties not to use or disclose Eightpoint's confidential information for their own benefit or the benefit of a competitor and not to misappropriate corporate opportunities.

**C. Eightpoint's Internal "Blaze" Browser Concept**

49. Before adopting the "Wave" name, Eightpoint internally considered "Blaze Browser" as a candidate product name. On or about November 9, 2021, Horvath acknowledged that "Blaze Browser" had been on Eightpoint's final list of candidate names before "Wave" was selected. Tucker was aware of Eightpoint's internal consideration and use of the "Blaze" name and of Eightpoint's related internal browser initiatives, by reason of his senior position at Eightpoint Interactive and his direct exposure to Eightpoint's product roadmap, branding, and confidential strategy during his employment.

50. Eight months after Tucker left, and two months after Horvath left, on November 14, 2024, Eightpoint's research-and-development team prepared internal materials for an "Eightpoint Blaze Browser" concept, a lightweight browser intended to compete in the print, manuals, and templates verticals.

Eightpoint registered and held the domain blazebrowser.co in connection with this concept, that very same day.

51. Although Eightpoint's internal concept post-dated Horvath and Tucker's departures, upon information and belief both learned of Eightpoint's internal "Blaze" browser work through one or more Eightpoint personnel who remained employed at Eightpoint after their departures.

**D. Horvath and Tucker Leave and Form the Blazer Ecosystem**

52. On March 15, 2024, Tucker voluntarily resigned from Eightpoint Interactive, and on September 13, 2024, Horvath voluntarily resigned. Both resigned to compete with Eightpoint, Tucker through Broadburst, Horvath through Nearset, and both through Blazer Browser.

53. On October 31, 2024, Tucker incorporated Broadburst, and on November 25, 2024, Horvath incorporated Nearset. Prior to Tucker's resignation, Broadburst-associated domains were registered and in use, including broadburstmedia.com and broadburst.io. Upon information and belief, Tucker planned and prepared to compete while still employed by, and owing duties to, Eightpoint. Tucker also met Broadburst co-founder, Setaro, while managing a relationship between Eightpoint Interactive and Setaro's other legal entity, Hudson Interactive LLC.

54. Eleven days after Broadburst was incorporated, on November 11, 2024, the domain blazerbrowser.com was registered. Three days later, on

November 14, 2024, the domain blazerhome.com was registered. During the same period, Eightpoint was developing its own "Blaze" browser concept and registered and held the blazebrowser.co domain.

55. Blazer LLC, the consumer-facing publisher entity, was not incorporated in Delaware until June 25, 2025, seven and one-half months after blazerbrowser.com domain was first registered. From the time the domains were registered until the Delaware company was incorporated, upon information and belief, the domains were registered, controlled, and held by Tucker, Horvath, and Johnson, directly or through their affiliated entities (including Broadburst), in anticipation of launching Blazer Browser before Blazer LLC was formed.

56. On October 1, 2025, Blazer Browser was publicly launched and promoted through press releases which quoted Johnson as the product's spokesperson and identified Johnson as the Blazer Browser media contact. Thereafter, Blazer Browser was listed on the Microsoft Store.

### E. Blazer Browser's Monetization Is Routed Through Tucker's Broadburst

57. Blazer Browser's new-tab page fires a click beacon from a third-party advertising-technology company, whose publisher parameter is "pub=broadburst-blazerbrowser," routing Blazer Browser's content-feed

advertising revenue through a Broadburst-named publisher account. This connection ties Tucker's Broadburst directly to Blazer Browser's monetization.

58. The same third-party advertising-technology company, which is also a significant monetization partner of Wave Browser, has circulated promotional materials containing an endorsement attributed to Tucker, identified with Broadburst, as the point of contact for the Blazer Browser property. In his endorsement, Tucker describes deploying the company's user-engagement monetization feature on Blazer Browser's article-page scroll and page-back interactions and states that the company performed the integration without any work by Blazer Browser's own developers. Tucker's endorsement reflects that he personally directs the development, management, user-experience design, and monetization of Blazer Browser.

59. Blazer Browser also monetizes search through Yahoo Hosted Search, the same syndication channel used by Wave Browser, and Broadburst separately operates a Yahoo-fed search product ("AirSearch"). Upon information and belief, Blazer Browser and Broadburst's AirSearch product share a common search-syndication intermediary, further tying Blazer Browser's search monetization to Broadburst.

60. Upon information and belief, Broadburst and Tucker solicited, exploited, or diverted Eightpoint's relationship with AirFind Corp. ("AirFind") to develop AirSearch and establish Blazer Browser's search monetization.

61. Broadburst's AirSearch extension is delivered through AirFind's Yahoo Hosted Search feed. By targeting and appropriating Eightpoint's advertising and search syndication relationships Tucker and Broadburst diverted business relationships that belong to Eightpoint.

### F. Blazer Browser Contains Eightpoint's Source Code and Replicates Wave Browser's Proprietary Architecture

62. Blazer Browser was built, in part, from Eightpoint's source code. The Windows build of Blazer Browser currently distributed by Defendants, version 3.3.148.1, is downloaded from a content-delivery domain controlled by Defendants. Blazer Browser's principal library and installer in this version each contain a block of Eightpoint's proprietary configuration text reproduced byte for byte from Eightpoint Technologies' Wave Browser source code.

63. The copied block identifies Eightpoint's Wave Browser source tag, Eightpoint's advertising-provider identifier, Eightpoint's Wave Browser implementation identifier, and two Wave Browser domains (wavebrowser.co and ntp.mywavehome.net). It occurs exactly once in each of Blazer Browser's two program files. The copied block further reproduces a typographical idiosyncrasy present in Eightpoint's source file—a single stray space in one entry where the remaining entries have none—that exists only as a typographical error from an Eightpoint employee.

64. The exact form of the copied block existed in Eightpoint's source code for a period of approximately seven weeks. Eightpoint's version-control history establishes that the block took this form on November 3, 2023, and that Eightpoint changed one of its values on December 22, 2023. Blazer Browser's copy therefore indicates that Blazer Browser was built from a copy of Eightpoint's source code taken between November 3, 2023 and December 22, 2023. During that period, Horvath and Tucker were employed by Eightpoint Interactive in the positions described above, and each had access to Eightpoint's source-code repository subject to the confidentiality obligations described above.

65. On information and belief, the copying of Eightpoint's source code into Blazer Browser was not confined to the block described above. That block is a fragment of a larger configuration component and of the installer utilities that consume it, and the full extent of the Eightpoint source code incorporated into Blazer Browser is ascertainable only from Defendants' source code and build records.

66. A comparison of Blazer Browser and Wave Browser reveals that Blazer Browser reproduces the distinctive architecture and business logic of Eightpoint's proprietary monetization design, differing principally in surface implementation details such as host names and encoding.

67. Wave Browser's new-tab-page tracking parameters are reproduced in Blazer Browser as follows: Wave Browser passes a specific, custom, combination of fields—user identifier, session, software version, campaign/source chain, and subscription tier—to the remotely hosted new-tab page; Blazer Browser passes the same field set, wrapped in base64-encoded composite that, when decoded, maps one-to-one to Wave Browser's fields. This specific field combination is not a Chromium feature, an industry standard, or a search-syndication requirement; it is unique to Eightpoint. On information and belief, the base64 wrapper was selected to obscure the underlying parameter parity.

68. Versions of Wave Browser, developed during Horvath and Tucker's employment at Eightpoint Interactive, posted impression events to an endpoint following an imp.[domain]/i convention and carried a defined parameter taxonomy. Blazer Browser posts impression events to imp.blazerbrowser.com/i—the same endpoint convention—and carries a corresponding parameter set. The combination of the endpoint shape, the new-tab-page parameter taxonomy, and the supporting configuration scaffolding is a proprietary Eightpoint design, not a Chromium or industry default.

69. Wave Browser serves a fully remote, vendor-controlled new-tab page that is fetched on every new-tab open with tracking parameters appended to the URL; hosts an artificial-intelligence-summarized news feed on the same

vendor-controlled domain, with tracking continuity into article views; and auto-focuses an embedded, monetized search input rather than the browser's address bar. Blazer Browser matches each of these design choices. None of these choices are native to Chromium; in combination they reflect Eightpoint's proprietary, monetization-first architecture, which Blazer Browser reproduced.

70. Blazer Browser's pre-install landing page reproduces Wave Browser's staged, three-step walkthrough above a prominent, green-colored call-to-action with disclosures placed beneath, and Blazer Browser's installer dialog matches Wave Browser's in button color, shape, wording, and disclosure-link placement. Blazer Browser also reused Wave Browser's bespoke post-download "hand-holding" audio walkthrough—copying Eightpoint's script verbatim and substituting only a different computer-generated voice. A custom onboarding audio script is neither a Chromium feature nor an industry convention; its verbatim reuse reflects direct copying by persons familiar with Wave Browser rather than independent creation.

71. The foregoing parallels reflect the use of Eightpoint's confidential information by persons familiar with Wave Browser's architecture. Eightpoint's internal technical comparison further observed that the tracked field set, and underlying business logic overlap in a manner consistent with informed copying rather than independent development.

72. Upon information and belief, Felsinger, Lautier, Bolton, and Coulter are among the persons familiar with Wave Browser's architecture who may have participated in, or have knowledge regarding, the design and development of Blazer Browser. Each participated in the development of Wave Browser while employed by Eightpoint Interactive, ultimately reported to Tucker or Horvath, and each had access to the Eightpoint Trade Secrets reflected above.

73. Each Defendant participated in the misappropriation of the Eightpoint Trade Secrets and Eightpoint's source code. Horvath and Tucker acquired the Eightpoint Trade Secrets through their employment at Eightpoint Interactive, subject to duties of confidentiality, and thereafter used and disclosed them in developing, launching, and monetizing Blazer Browser. Upon information and belief, Nearset, which Horvath manages, used the Eightpoint Trade Secrets in developing Blazer Browser's browser application and monetization architecture. Broadburst, which Tucker manages, used the Eightpoint Trade Secrets in structuring and operating Blazer Browser's content-feed and search monetization and in diverting Eightpoint's search-syndication relationships. Blazer LLC improperly uses the Eightpoint Trade Secrets by publishing and distributing a product that embodies them, with knowledge—through its principals Tucker, Horvath, and Johnson—that they were derived from Eightpoint. Upon information and belief, Tucker Interactive

and Johnson, as instrumentalities of and participants in the ownership, management, promotion, and operation of Blazer Browser, participated in and benefited from that use.

### G. Blazer Browser Imitates Wave Browser's Branding and Domain Strategy

74. Blazer Browser mirrors Wave Browser's distinctive satellite-domain naming convention. Wave Browser operates, or has operated, feature- and vertical-themed domains following a "[Feature] With Wave" pattern including printwithwave.com, convertwithwave.com, and recipeswithwave.com. Blazer Browser uses the identical pattern—printwithblazer.com, convertwithblazer.com, and recipeswithblazer.com, respectively—across a portfolio of domains, several of which were registered in same-day clusters. Eightpoint's use of this convention predated Blazer Browser and was known to both Tucker and Horvath during their employment at Eightpoint.

75. Blazer Browser's paid-acquisition placements target the same printing, PDF conversion, recipe and kitchen verticals that Wave Browser targets, mapping to Blazer Browser's corresponding satellite domains in a manner that tracks Wave Browser's vertical-targeting strategy.

76. Blazer Browser's name and branding were derived from Eightpoint's internal "Blaze" branding. The "Blazer" name is Eightpoint's

internal "Blaze" designation with a single added letter, and Blazer Browser's flame-styled mark and color scheme evoke the branding associated with Eightpoint's internal "Blaze Browser" project. Upon information and belief, Eightpoint's internal "Blaze" information was conveyed to and exploited by Defendants.

**COUNT I: MISAPPROPRIATION OF TRADE SECRETS (FEDERAL)**
***Eightpoint Against All Defendants***

77. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78. The Eightpoint Trade Secrets are trade secrets within the meaning of 18 U.S.C. § 1839(3).

79. Eightpoint took reasonable measures to protect the Eightpoint Trade Secrets, and they derive independent economic value from not being generally known to, or readily ascertainable through proper means by others who could obtain economic value from their disclosure or use.

80. The Eightpoint Trade Secrets relate to products and services used in and intended for use in interstate and foreign commerce.

81. Defendants misappropriated the Eightpoint Trade Secrets, acquired through Horvath and Tucker's employment at Eightpoint Interactive, and retained the Eightpoint Trade Secrets for their use after departing Eightpoint Interactive. Defendants misappropriated the Eightpoint Trade

Secrets with knowledge that they had acquired the Eightpoint Trade Secrets through improper means, in breach of their fiduciary and contractual duties.

82. Defendants' use of the Eightpoint Trade Secrets was not the product of reverse engineering or independent derivation.

83. As a direct and proximate result, Eightpoint has suffered damages in an amount to be proven at trial, and irreparable harm. Once the Eightpoint Trade Secrets are disclosed and embodied in a competing product, they cannot be restored to secrecy, and Defendants' continued use threatens the irretrievable loss of Eightpoint's competitive position, goodwill, and the value of the trade secrets themselves.

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS (STATE)

***Eightpoint Against All Defendants***

84. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

85. The Eightpoint Trade Secrets constitute trade secrets within the meaning of Fla. Stat. § 688.002(4): they derive independent economic value from not being generally known or readily ascertainable by proper means and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy. As asserted above, the protected secret is the specific, field-tested combination and architecture as an integrated whole, and not generic information.

86. Defendants misappropriated the Eightpoint Trade Secrets within the meaning of Fla. Stat. § 688.002(2) by acquiring them with knowledge or reason to know that they were acquired by improper means, and by using and disclosing them without express or implied consent, as set forth above.

87. As a direct and proximate result, Eightpoint has suffered damages. Eightpoint has no adequate remedy at law and is suffering and will continue to suffer irreparable harm from Defendants' actual and threatened misappropriation, which, absent injunctive relief, will cause the irretrievable loss of the secrecy and value of the Eightpoint Trade Secrets and of Eightpoint's competitive position and goodwill. Eightpoint is entitled to injunctive relief under Fla. Stat. § 688.003; damages for actual loss and unjust enrichment, or a reasonable royalty, under Fla. Stat. § 688.004(1); exemplary damages of up to twice the compensatory award under Fla. Stat. § 688.004(2) for willful and malicious misappropriation; and attorneys' fees under Fla. Stat. § 688.005. Eightpoint seeks exemplary damages under Fla. Stat. § 688.004(2) and attorneys' fees under Fla. Stat. § 688.005 against all Defendants, including Horvath and Tucker.

88. In the alternative, to the extent the law of Kansas or Nevada governs any portion of the misappropriation, Eightpoint asserts parallel claims under the Kansas Uniform Trade Secrets Act, Kan. Stat. Ann. §§ 60-3320 to 60-3330, and the Nevada Uniform Trade Secrets Act, Nev. Rev. Stat. §§

600A.010 to 600A.100, which contain materially similar elements and remedies.

## COUNT III: COPYRIGHT INFRINGEMENT

### *Eightpoint Technologies Against All Defendants*

89. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

90. Eightpoint Technologies owns original works of authorship fixed in tangible media, including Wave Browser's source code, which are protected under the Copyright Act.

91. Wave Browser's code and related works were authored by employees of Eightpoint Interactive (then Spigot, Inc.), a United States employer, within the scope of their employment and as works made for hire were assigned to Eightpoint. Wave Browser is a published United States work.

92. Eightpoint Technologies holds title to these works by assignment within the Eightpoint group—a matter of chain of title that does not affect the works' status as United States works.

93. Eightpoint Technologies registered the copyright in these works with the United States Copyright Office using a trade-secret-protective deposit, including redacted or object-code deposit material, consistent with Copyright Office practice for computer programs containing trade secrets (*see* U.S. Copyright Office, Circular 61; 37 C.F.R. § 202.20).

94. Eightpoint Technologies' registered copyright, entitled "Wave Browser," bears Registration No. TX-9-628-406 with an effective registration date of August 20, 2026. A true and correct copy of the registration certificate is attached hereto as Exhibit D.

95. On information and belief, the Defendants copied original, protectable elements of Eightpoint Technologies' copyrighted works in creating Blazer Browser, including by carrying Wave Browser code or its protectable expression—authored in part by Horvath and Tucker—into Blazer Browser, and reproduced, prepared derivative works based upon, distributed, and publicly displayed those works without Eightpoint's authorization, in violation of 17 U.S.C. §§ 106 and 501.

96. Upon information and belief, Defendants' infringement was knowing and willful.

97. Defendants' acts of copyright infringement have caused irreparable harm to Eightpoint and have caused Eightpoint to suffer damages.

**COUNT IV: COMMON LAW UNFAIR COMPETITION**

***Eightpoint Against All Defendants***

98. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

99. Eightpoint has valuable, protectable interests in the product-development investment, business strategy, and internal branding work it

created for Wave Browser and for its internal "Blaze Browser" project. The Defendants engaged in unfair competition by, among other things, misappropriating the fruits of Eightpoint's investment in its products and strategy, and by exploiting Eightpoint's internal, unreleased "Blaze Browser" project—including its candidate name and associated branding—of which Horvath had knowledge during his employment, rather than competing through their own independent development.

100. As a direct and proximate result of the Defendants' unfair competition, Eightpoint has suffered damages, and Defendants have unfairly profited.

**COUNT V: BREACH OF CONTRACT**

***Eightpoint Interactive Against Horvath***

101. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

102. Eightpoint Interactive (then Spigot, Inc.) and Horvath entered into the Non-Compete, which is reduced to writing and signed by Horvath and by Eightpoint Interactive. The Non-Compete provides that it is governed by Florida law, Ex. A, § 7, and is a restrictive covenant enforceable under Fla. Stat. § 542.335.

103. The Non-Compete is justified by the existence of one or more legitimate business interests within the meaning of Fla. Stat. § 542.335(1)(b),

namely, protection of Eightpoint's trade secret and other valuable confidential information, protection of Eightpoint's relationships with advertisers, vendors, distribution partners, and customers, and protection of Eightpoint Technologies' goodwill associated with Wave Browser.

104. The Non-Compete is reasonably necessary to protect the legitimate business interests because the covenant runs for twelve (12) months following termination, is limited to the business in which Eightpoint has sold products and is tied to identified categories of competitive activity.

105. Horvath breached the Non-Compete. During the twelve (12) month restricted period following his departure, Horvath engaged in, rendered services to, and developed the competing Blazer Browser product through Nearset, by designing, engineering, and programming Blazer Browser's browser application and monetization while the Non-Compete restraint was in force.

106. The development and preparation of the competing product occurred within the restricted period, and Horvath used Eightpoint's trade secrets to divert business and business relationships to Blazer Browser.

107. Upon information and belief, during the restricted period Horvath also solicited advertisers and publishers of Eightpoint with whom he had contact or of whose identity he learned as a result of his employment, in violation of Section 2.2 of the Non-Compete.

108. All conditions precedent to the relief demanded have been satisfied, have occurred, or have otherwise been excused.

109. Eightpoint has suffered damages in an amount to be proven at trial, and irreparable harm, including the ongoing, perpetual diversion of its trade secret and business relationships.

**COUNT VI: BREACH OF CONTRACT**

***Eightpoint Interactive Against Horvath and Tucker***

110. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

111. Horvath and Tucker each entered into a written PIIA with Eightpoint Interactive (then Spigot, Inc.)—the Horvath PIIA and the Tucker PIIA, respectively—each of which is signed by the respective employee.

112. Each PIIA was a material part of the consideration for Horvath's and Tucker's respective employment. Horvath and Tucker had a perpetual obligation to hold in confidence and not to use or disclose Eightpoint's proprietary information, including but not limited to Eightpoint's source code, object code, algorithms, designs, configurations, business plans, marketing, forecasts, pricing, customer information, and other technical and business information. Horvath and Tucker also assigned to Eightpoint all inventions and works of authorship made during employment as works made for hire.

113. Tucker's PIIA specifically includes a covenant not to encourage or solicit any Eightpoint employee to leave during the term of employment and for one (1) year thereafter; while Horvath's does not because the covenant was reduced to Horvath's separate Non-Compete.

114. Horvath and Tucker breached their respective PIIAs. Both used or disclosed Eightpoint's proprietary information for the benefit of the Blazer ecosystem. Horvath used Eightpoint's source code, technical architecture, algorithms, and development methodologies. Tucker used Eightpoint's business strategy, unit economics, media-buying methods, distribution-partner relationships, and customer-acquisition playbooks.

115. Tucker also breached Section 3(g) of the Tucker PIIA by soliciting and hiring Coulter, an Eightpoint Interactive employee, within his one-year post-termination window.

116. Tucker further breached Section 3(i) of the Tucker PIIA by assisting in preparing to compete with Eightpoint while still employed, including through the registration and use of Broadburst-associated domains prior to his resignation.

117. All conditions precedent to the relief demanded have been satisfied, have occurred, or have otherwise been excused.

118. Eightpoint has suffered damages in an amount to be proven at trial, and irreparable harm.

## COUNT VII: BREACH OF THE DUTY OF LOYALTY

***Eightpoint Interactive Against Horvath and Tucker***

119. Eightpoint reavers and realleges the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

120. Horvath was the Chief Technology Officer of Eightpoint Interactive. Tucker was Vice President and General Manager. Both occupied a position of trust and confidence and owed Eightpoint fiduciary duties of loyalty, including the duty to maintain the confidentiality of Eightpoint's proprietary information.

121. Horvath breached his duty of loyalty by using and disclosing Eightpoint's confidential information and trade secrets for the benefit of a competitor, by preparing to compete and competing through Nearset, developing Blazer Browser, and by usurping a corporate opportunity belonging to Eightpoint, including the "Blaze" browser concept of which he had knowledge during his employment.

122. Tucker breached his duty of loyalty by using and disclosing Eightpoint's confidential business information, including but not limited to, business strategy, unit economics, media-buying methods, distribution-partner relationships, and customer-acquisition playbooks for the benefit of Broadburst and Blazer Browser, soliciting and diverting Eightpoint's advertising and search-syndication relationships including the relationship

with AirFind, planning and preparing to compete while still employed, through Broadburst-affiliated entities and domains which existed prior to Tucker's resignation, and by soliciting or assisting in the solicitation of Eightpoint personnel.

123. As a direct and proximate result, Eightpoint has suffered damages in an amount to be proven at trial, and irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Eightpoint respectfully requests that the Court enter judgment in its favor and against the Defendants, and grant the following relief:

a. Permanent injunctive relief, pursuant to 18 U.S.C. § 1836(b)(3)(A) and Fla. Stat. § 688.003, enjoining Defendants from using, disclosing, or benefiting from the Eightpoint Trade Secrets; from developing, distributing, marketing, or selling Blazer Browser to the extent it embodies, incorporates, or was developed through the use of the Eightpoint Trade Secrets, and requiring Defendants to withdraw Blazer Browser from distribution; from infringing Eightpoint Technologies' copyrights under 17 U.S.C. § 502; from breaching the surviving restrictive covenants, including Section 2.3 of the Non-Compete and the confidentiality and non-use provisions of the Horvath PIIA and the Tucker PIIA; and from engaging in

unfair competition; and requiring the return or destruction of all misappropriated materials and of any source code, software, builds, or works that incorporate, embody, or are derived from the Eightpoint Trade Secrets or that infringe Eightpoint Technologies' copyrights;

b. Compensatory damages in an amount to be proven at trial, including Eightpoint's actual losses and lost profits, as against all Defendants, including under 18 U.S.C. § 1836(b)(3)(B), Fla. Stat. § 688.004(1), and 17 U.S.C. § 504(b);

c. Disgorgement of the Defendants' profits and other amounts by which the Defendants have been unjustly enriched, and the imposition of a constructive trust;

d. A reasonable royalty to the extent damages are measured on that basis under applicable law;

e. Exemplary and punitive damages as permitted by law for willful and malicious misappropriation, including under Fla. Stat. § 688.004(2) as against all Defendants, and under 18 U.S.C. § 1836(b)(3)(C) as against all Defendants other than Horvath and Tucker;

f. Enhanced and statutory damages as permitted under the Copyright Act, 17 U.S.C. § 504;

g. Eightpoint's reasonable attorneys' fees and costs as permitted by contract and by law, including under Fla. Stat. §§ 542.335 and 688.005, and 17 U.S.C. § 505 as against the applicable Defendants, and under 18 U.S.C. § 1836(b)(3)(D) as against all Defendants other than Horvath and Tucker;

h. Pre-judgment and post-judgment interest as permitted by law; and

i. Such other and further relief as the Court deems just and proper.

Dated: September 16, 2026

Respectfully submitted,

By: */s/John C. Carey*
John C. Carey (FBN 78379)
Email: jcarey@careyrodriguez.com
Ethan B. Rodriguez (FBN 1036022)
Email: erodriguez@careyrodriguez.com
**CAREY RODRIGUEZ LLP**
121 Alhambra Plaza, Suite 1000
Coral Gables, Florida 33134
Tel: 305.356.5455
Fax: 305.372.7475